## MAX LANTIN *vs.* EDWARD B. GOODNOW & others.

Norfolk. November 10, 1910. — January 4, 1911.

Present: KNOWLTON, C. J., MORTON, LORING, SHELDON, & RUGG, JJ.

*Conspiracy. Fraud. Joint Tortfeasors. Executor and Administrator.*

One who for many years had carried on a " bucket shop " business, representing it to be a legitimate brokerage business, realizing from his physical condition that he might die suddenly, and from the financial condition of his business that because of lack of confidence among his customers the business thereupon might fail, with an intention of causing the business to be continued after his death without interruption until claims of creditors against his estate would be barred under R. L. c. 141, § 9, falsely represented his assets to be largely beyond their real value, made a will containing provisions directing the executors to assist the business with funds after his death and associated with himself two partners who agreed to carry out these intentions. After his death the two partners did as they had agreed, and the executors of the will, who were the testator's widow, son and daughter, and who would benefit personally from the assets of the estate not being subject to be reached by creditors of the business, at first innocently but afterwards knowingly assisted in the carrying out of the scheme. At the end of two years from the giving of bonds by the executors, the partners were adjudicated bankrupt. In an action jointly against the two partners and the executors as individuals by a creditor, who had been a customer of the partnership before the death of the testator because he was deceived into thinking that theirs was a legitimate brokerage business, and who had been paid the balance due him at the testator's death and had continued a customer thereafter without knowledge of the death and because of the fraud of the testator participated in by the partners and by the widow and children as executors, it was *held*, that, not only the fraudulent partners, but also the widow and children of the testator were liable for the damages suffered by the plaintiff because of the fraudulent conspiracy jointly practised by them, and that this conclusion was not affected by the fact that the balance due to the plaintiff at the time of the testator's death had been paid, nor by the fact that payments made to the partnership by the widow and children had been made by them as executors, it appearing that such payments were made for their personal benefit.

CONTRACT OR TORT against Edward B. Goodnow, Anna F. Goodnow, Mabel L. Goddard, James Kennedy and Charles R.

Worth, with a declaration in two counts, one in contract and the other in tort. Writ dated November 22, 1906.

The count in contract was abandoned by the plaintiff both at the hearings before the auditor and at the trial, and the case was tried on the count in tort which in substance was as follows :

" Count 2. That on or about July 1, 1903, Nathan B. Goodnow and the defendants, Kennedy and Worth, were copartners in the banking and brokerage business under the firm name and style of N. B. Goodnow & Company ; that on or about the date aforesaid the said Goodnow, Kennedy and Worth unlawfully conspired to cheat and defraud the plaintiff, and in pursuance of such unlawful conspiracy represented to the plaintiff that they were solvent, that they were legitimate stock brokers and not bucket shop brokers, and that they did fulfil and intend to fulfil all orders to buy and hold stocks for their customers and all orders to sell stocks and hold the proceeds on deposit. They made these statements of fact, which were false and which they knew were false, in order to defraud the plaintiff by inducing him to become their customer, and the plaintiff, relying thereon, employed them as his brokers and at divers times gave orders to buy shares of stock in his name and hold the same for him, sent money to pay for the same, and gave orders for the sale of part thereof and for the retention of the proceeds thereof on deposit for him. The said firm, upon receipt of each such order, in pursuance of the said unlawful conspiracy, notified the plaintiff of the fulfilment thereof. According to their reports, and according to their legal obligation in the premises, they held for him and should hold for him certain valuable shares of stock, and owed and should owe him certain large sums of money on or about November 6, 1903. As a matter of fact said firm were not legitimate stock brokers, but were bucket shop brokers and in pursuance of the said unlawful conspiracy never bought the stock ordered by him, did not hold it for him, did not sell it as ordered, and did not retain the proceeds thereof on deposit for him, and were, on the said first day of July, 1903, and at all times since that date have been, utterly and hopelessly bankrupt and insolvent, as they at all times herein stated well knew.

" That on or about November 6, 1903, Nathan B. Goodnow died, leaving a will which was duly allowed and proved in this

Commonwealth on December 2, 1903, and on the same date Edward B. Goodnow, Anna F. Goodnow and Mabel L. Goddard were duly appointed executors thereof and duly gave bonds as such.   Said Nathan B. Goodnow had for some years past been drawing funds from the firm and had amassed therefrom a large amount of assets, although entirely insufficient even when joined with the firm assets and the assets of the other partners to meet the firm obligations.   In pursuance of the said unlawful conspiracy and for the purpose of successfully carrying out the same, said Nathan B. Goodnow by his will left certain large sums of money to Kennedy and Worth to carry on the business of said firm without interruption in the same name, same manner and at the same place, and to represent falsely and knowingly so to the plaintiff that they had been on or about July 1, 1903, and still were solvent, that they had been and were still legitimate stock brokers, and not bucket shop brokers, that they had fulfilled and still intended to fulfil all the plaintiff's orders to buy stocks, to hold them for the plaintiff, to sell them and retain the proceeds for the plaintiff, and that they then held as a matter of fact certain valuable shares of stock for him and certain deposits of money as per his orders.   This was done by the said Nathan B. Goodnow for the specific purpose of defrauding the plaintiff by inducing him to continue to be a customer of N. B. Goodnow and Company, and to give orders to buy shares of stock in his name, and hold the same for him, send on money to pay for the same, give orders for the sale of part thereof from time to time, and the retention of the proceeds thereof on deposit for him, and to give further orders to buy shares of stock in his name and hold the same for him, to order the application of proceeds held on deposit for him to that purpose, and to send on further money to pay for the same, and this was done by the said Nathan B. Goodnow for the ultimate purpose of keeping the concern going and concealing its insolvency until the two years from the date of the filing of the executors'.bond should elapse and until the plaintiff and other creditors should be barred by the statute of limitations from recourse against his estate for the money of which he had defrauded them.   Said Kennedy and said Worth participated in this conspiracy with full knowledge of the facts and of the specific and ultimate purposes said Nathan B. Goodnow

desired to accomplish.   Edward B. Goodnow, Anna F. Goodnow
and Mabel L. Goddard aforesaid, with full knowledge of all the
facts above recited, with full knowledge of the specific and ulti-
mate purposes of the conspiracy aforesaid and for the purpose of
successfully carrying out the same and of defrauding the plain-
tiff in pursuance thereof, saw to it that this money was paid to
Kennedy and Worth and that when this proved insufficient,
certain other sums of money were advanced out of said Nathan
B. Goodnow's estate to said Kennedy and Worth in pursuance of
the said unlawful conspiracy and to carry out and accomplish all
the purposes aforesaid in the manner detailed above and at all
times herein stated and in all ways in which they possibly could,
participated in and aided in the execution of the unlawful con-
spiracy aforesaid with full knowledge of all the facts pertinent
thereto.   Said Kennedy and Worth in pursuance of said unlaw-
ful conspiracy and in order successfully to consummate the same,
carried on the business of said firm without interruption in the
same name, same manner and at the same place, did not notify
the plaintiff of the death of Nathan B. Goodnow and represented
to the plaintiff falsely and knowingly so that they had been on
or about July 1, 1903, and were still solvent, that they had been
and were still legitimate stock brokers and not bucket shop
brokers, that they had fulfilled and still intended to fulfil all the
plaintiff's orders to buy stocks, to hold them for the plaintiff, to
sell them and retain the proceeds for him, and that they then
held as a matter of fact certain valuable shares of stock for him
and certain deposits of money as per his orders.   They did this to
lead the plaintiff to believe that all was well, to induce him to
refrain from hostile action, to induce him to refrain from closing
up his account with them and to lead him to continue to deal
with them and to send on to them further sums of money and
they did all this at the request of and in accordance with the
instructions of Nathan B. Goodnow, Edward B. Goodnow, Anna
F. Goodnow and Mabel L. Goddard, and each of them, and in
pursuance of the unlawful conspiracy aforesaid.   The plaintiff
relied on these facts and representations, believed all was well,
refrained from hostile action, did not close up his account with
them, and continued to deal from time to time with them, send-
ing in money, ordering purchases of stock in his name and the

holding thereof for him, and ordering sales of part thereof and the retention of the proceeds on deposit for the plaintiff, and ordering further purchases of stock in his name and the holding thereof for him and the application of the proceeds on deposit for him in part payment thereof and sending in further large sums of money therefor. The said firm upon the receipt of each such order notified the plaintiff of the fulfilment thereof and rendered to the plaintiff monthly statements of his account with said firm. On January 1, 1906, said firm purported to hold for the plaintiff . . . [certain] . . . shares of stock . . . and to hold . . . on deposit for him, $4,569.85. As a matter of fact the said firm had never bought the said shares of stock, did not hold them, and did not hold the said sum of money on deposit for the plaintiff, all of which the said firm and the said Edward B. Goodnow, Anna F. Goodnow and Mabel L. Goddard well knew. On or about January 1, 1906, the plaintiff demanded of said firm that they should deliver to him the said shares of stock and the said sum of money on deposit, but said firm refused and though often requested, still refuse to deliver and pay the same.

" On December 12, 1905, Edward B. Goodnow, Anna F. Goodnow and Mabel L. Goddard ceased to advance any further sum of money out of N. B. Goodnow's estate to the firm and ceased to assist them in the various ways in which they had previously been participating in and aiding in the fulfilment of the conspiracy aforesaid, since the two years had now elapsed within which the plaintiff must have brought action against the said estate for the property of which he had been defrauded, and since they believed that the ultimate purpose of the said unlawful conspiracy as far as they were concerned had been accomplished. Shortly after the first day of January, 1906, the said firm was duly adjudicated bankrupt and the assets of the firm's estate in bankruptcy were and are of insignificant value.

" The plaintiff says that he has been defrauded of the said sum of $4,569.85, and of the said shares of stock, . . . owing to the fraud and deceit of the defendants and of each of them, and owing to the unlawful conspiracy conceived by said N. B. Goodnow and carried out by all of the defendants in concert, with full knowledge of all material facts and for the purposes aforesaid."

The case was referred to Edmund A. Whitman, Esquire, as auditor, and afterward was tried before *Bell,* J.    The facts are stated in the opinion.

At the close of the evidence, the presiding judge ordered verdicts in favor of the three defendants, Edward B. Goodnow, Anna F. Goodnow and Mabel L. Goddard; and the plaintiff alleged exceptions.

Against the other defendants, James Kennedy and Charles R. Worth, the jury found for the plaintiff in the sum of $12,049.97.

*D. A. Ellis & S. M. Whalen,* for the plaintiff.

· *J. E. Hannigan,* (*C. G. Bancroft* with him,) for the defendants.

KNOWLTON, C. J.    This is an action to recover damages for frauds practised upon the plaintiff in connection with the business of the firm of N. B. Goodnow and Company, who advertised as bankers and brokers doing business in Boston and New York.    The defendants are one Kennedy and one Worth, the surviving members of this firm, and the widow and son and daughter of N. B. Goodnow, who were the principal legatees and devisees under his will.    The plaintiff obtained a verdict against Kennedy and Worth.    A verdict for the other defendants was directed by the presiding judge.    The case is here on the plaintiff's exception to the direction of this verdict.    There was an auditor's report from which we make extracts as follows : " Nathan B. Goodnow did business in Boston for a number of years prior to 1900, ostensibly as a banker and broker.    The defendants, Kennedy and Worth, were in his employ for a number of years.    Worth, who is now forty-two years of age, entered Mr. Goodnow's employ when he was twenty-one as a clerk, and worked up to the position of managing the finances of the business under Mr. Goodnow's personal supervision.    Mr. Kennedy, who is now sixty-five, entered Mr. Goodnow's employ in 1883. His previous experience had been on a farm, in teaching school and as a bookkeeper and clerk for some book publishers.    For some years previous to his death Mr. Goodnow had shown signs of an apprehension of impending death through some trouble with his heart ; having been a heavy smoker he practically gave up smoking, was careful in his habits of exercise and, while he said nothing about his own condition, spoke of members of his

family as having had difficulty in that way and that he might go as they did. Somewhere about the year 1900 he called Kennedy and Worth into his office and told them that he was going to take them into partnership, saying that they had been faithful and that they ought to share in the business. He said that they ought to make enough in a few years to enable them to retire, and named a sum with which they ought to be satisfied, and that they might take one third and he would take two thirds, and said that he would allow the use of his name for two years should he die. He told them further that he wanted them to agree to carry the business on after his death, as he did not want his family to know the kind of business he had been doing, which was what is technically known as a bucket shop, where, when a customer gives an order to purchase, or sell, shares of stock the broker does not carry out the order, but credits or charges the customer with the price at which the stock may be selling upon the stock exchange at that particular time. He said further that his son lived in Detroit and was sickly and he did not want him to carry on the business. At Goodnow's request Kennedy and Worth promised to continue the business. No partnership papers were then drawn up and the business went on under an oral partnership, the parties performing the same duties they had previously performed and in the same manner, with substantially the same salaries, and with no more real control over the business. Notices were, however, sent out that such a partnership had been formed. Mr. Goodnow made a will, which was dated October 4, 1902, and, at or about that time, informed Kennedy and Worth of the provisions therein for their benefit which were contained in the seventh clause of the will and were to the effect that all his interest in the business of Nathan B. Goodnow and Company was to be given to his partners, and that they were to have half of his life insurance, which amounted to $68,000, absolutely, and the other half was to be loaned to them at three per cent interest without security and to be repaid in five equal annual instalments. . . . In March, 1903, formal articles of copartnership were drawn up and signed. Mr. Goodnow prepared a draft in his own handwriting and read it to Kennedy and Worth, and subsequently had the matter put in typewritten form, when it was executed by them all." Under

these articles Goodnow was to contribute the established business of Nathan B. Goodnow and Company, conducted in Boston and New York, ·with all the property in the business, and it was provided that Goodnow should draw from the firm $3,300 per annum, and each of the others $1,300 per annum; that profits might be drawn upon the consent of the parties in writing, and that they should be divided in the proportion of one half to Goodnow and one fourth to each of the others; that at the death of either partner, his interest should cease, and his legal representatives should not receive anything from the firm, and that the firm name of Nathan B. Goodnow and Company should be discontinued within two years of his retirement or decease. " Mr. Goodnow told Kennedy and Worth that he saw no reason why they all could not get rich out of it, and that in two years' time they ought to be in very good condition, and that he would let them have the use of his name for that time and at the end of it they could quietly change the name of the business so that it would not make any difference with the customers, and that he did this so that the customers would not come upon them suddenly for their balances. He did not want them to be embarrassed. He again told them what provision he had made for them in the will by his insurance, and with what money there was coming in they ought to be able to carry on the business without trouble. He again reiterated that he did not want his son or daughter to know the character of the business, but they (the son and daughter) thoroughly understood that if Kennedy and Worth wanted more money they could have it. No other reason was given by Mr. Goodnow for limiting the use of his name to two years, and nothing was said about any liability of his estate for the debts of the business. Somewhere about 1893 Mr. Goodnow had built the Grand Opera House in Boston, which cost him about $250,000, and the funds therefor had been drawn by him from the business. Some time before 1900 he had furnished money for the support of a theatrical company, and later had furnished the financial backing for Alexander Salvini, both of which had been losing ventures. The funds for these had been taken from the business, and, as a result, the business had been very seriously crippled, at one time the concern having but $10,000 of available assets in the business.

" Mr. Goodnow, apparently realizing this situation, had published and sent to customers a circular . . . in which he called attention to the amount of real estate standing in his name, assessed at $235,000, which was part of his assets, and therefore the assets of the firm, and an advertisement to substantially the same effect was inserted in the Boston Journal, and ran regularly for a number of years, once every two weeks. Mr. Goodnow's nominal capital on the books of the firm was carried as $200,000, and upon this he drew two per cent per annum.

" A few days before Mr. Goodnow died, Mr. Worth had a conversation with him in which Mr. Goodnow recognized his impending death, and when Mr. Worth reminded him of the condition of the business and that there were not assets immediately available in the business sufficient to pay its indebtedness in full, said that he was aware of that, but that he had a thorough understanding with his heirs and that Kennedy and Worth were to have money to run the business if he was taken away. At that time the obligations of the firm were about $400,000, and the amount of available securities in their hands for the payment of such obligations was only about $125,000."

The inventory filed after Goodnow's death showed personal property appraised at $136,855.86 and real estate appraised at $167,450, not including any interest in the firm, nor certain property owned by him in Detroit. He died on November 6, 1903; and on December 2, 1903, his widow, son and daughter qualified as executors of his will. The firm gave no notice of his death, but Kennedy and Worth continued the business under the same firm name and in the same way as in his lifetime, until their failure in January, 1906. The plaintiff continued to do business with the firm, and had no knowledge of any change in it until the bankruptcy of Kennedy and Worth. Long before that time he had received a copy of the circular stating Goodnow's investment in real estate. His first transaction with the firm was in July 2, 1903, when he ordered the purchase of one hundred shares of a certain stock, and at intervals he ordered other purchases and sales, and sent and received money, so that, at the time of the firm's failure, they owed him a balance of $4,569.85 in money, and he was entitled to receive

from them shares of different stocks worth $5,237.50, which they did not have in possession and could not deliver. He received from them accounts of their dealings from time to time, which represented that they had made real purchases and sales on his account, and, until their failure, he supposed that such purchases and sales had been made.

There was some delay in furnishing Kennedy and Worth with the insurance money to be paid them under the will. They received the amount which was payable to them absolutely in sums of $5,000 or $10,000 at a time, which were paid through the son Edward B. Goodnow; but up to September, 1905, they had received but little of the part to be lent to them. In this month of September, in connection with their requests for money, a conference was had between them and an attorney who had acted for N. B. Goodnow in his lifetime and who represented the executors after his death, and Goddard, who was the husband of the testator's daughter. At this interview Goddard and the attorney were told of the embarrassed condition of the firm at the time of Nathan B. Goodnow's death; that it was and always had been a bucket shop, meaning that it made fictitious purchases and sales of stock and false returns to customers that purchases and sales were actually made, and that it was then in an embarrassed condition. At another interview, a little later, when these persons and Edward B. Goodnow and his father in law, a lawyer from Detroit, were present, the same matters were talked over. According to the testimony, Goddard said that they would have to take care of them (the firm) until the two years expired. "He said, 'Of course we will let you have money.' . . . 'We are obliged to. We will have to until the two years are up, at any rate.'" He said: "Yes, we will have to give you money. They are bound to take care of you." There was evidence that after that one of the partners went to the attorney's office almost every afternoon, at his request, to let him know how things were, and that, after the firm got into difficulty, there were no cases that he did not report. In one matter a letter was dictated by the attorney and signed by the firm. There was evidence that at one of these interviews the defendant Edward B. Goodnow said, "I shall advise putting every cent into this — every cent of the estate, to keep

father's name from being ground in the dust." Payments were made at different times after this to the members of the firm before the expiration of two years from the appointment and qualification of the executors. A payment of $2,000 was also made on December 2, 1905, the day on which the two years expired, one of $3,000 on December 16, 1905, and one of $1,000 on January 2, 1906. The defendants then refused to pay anything more, and on January 6, 1906, the firm stopped business.

There was testimony that, while he was in the hospital, just before he died, N. B. Goodnow, in reply to an inquiry from them as to whether he realized how things were in the business if anything happened to him, said: " Yes, I have made provision for that. I think my heirs thoroughly understand, and will advance money to take care of anything that comes up." He said of the money in the business: "That and the insurance that you will get ought to tide things along for some time. . . . Ned and Joe [meaning his son and son in law] thoroughly understand the situation and will help you to a certain amount," stating the amount as $20,000 or $30,000 which was not included in the insurance.

The business of the firm, as it was conducted, was unquestionably a fraud upon the plaintiff, which made the defendants Kennedy and Worth liable to him for the wrong. *Todd* v. *Bishop,* 136 Mass. 386, 391. *Tallant* v. *Stedman,* 176 Mass. 460. There was evidence proper for the consideration of the jury upon the question whether N. B. Goodnow, having invested a large amount of property outside of his business and apprehending his early death, and knowing that there was a great risk, if not a strong probability, that the debts of the business at the time of his death would greatly exceed its assets, formed a scheme to take Kennedy and Worth into partnership with him, and to arrange with them to carry on the business without change for two years after his death, while many of the creditors would remain ignorant of his death and be lulled into security until their claims would be barred by the special statute of limitations. It was consistent with such a scheme that the advertisement in the Boston Journal, containing the substance of the circular setting forth the strength of the firm and its large investments in real estate, was continued without

change until January, 1906. The provision in the will as to the life insurance was such that the whole of it would be available for use in the business " to tide things along for some time," while half of it would be a debt in favor of his family if the business should turn out fortunately. Worth testified as to what he said about the use of the firm name for two years; " that was, of course, not to arouse the suspicions or the anxiety of our customers so that they would not make any great demands on us." He also testified that when the papers were first drawn up there was nothing about the insurance, but that afterwards Goodnow told him "he had written up a new clause, and he was going to leave the whole of the insurance with us, " etc.

If the testator devised this scheme to defraud his creditors, and to secure to his family a large amount of property that otherwise would have been used in paying his debts, the scheme contemplated the probability that their customers might continue doing business with the firm, relying upon the indications and representations of its financial strength, and be defrauded by transactions of the bucket shop which they supposed were real purchases and sales. It contemplated the continuance of his fraud, as he planned it, for two years. It looked to a possible loss to the plaintiff and other creditors, as a consequence of the execution of the plan. The fraud was that of the testator through the whole two years while it was in the course of execution by his representatives as he intended it to be executed. If the statute provided for the survival of such a cause of action, the estate of the testator would be liable for the fraud.

There was evidence for the consideration of the jury on the question whether these defendants, the sole beneficiaries of the fraud, adopted it and participated in it for their own benefit, after they became aware of its nature. There were circumstances from which the jury might infer that all of the defendants learned of the facts and knew of the fraud in the autumn of 1905. There was evidence tending to show that the female defendants authorized the attorney and Goddard to do anything that they thought for the interest of these beneficiaries in the management of the business. Notwithstanding that the will called for loans from the insurance money to the firm by the

executors, the jury might find that these defendants became convinced that these provisions of the will were a part of a plan to defraud creditors of the firm, and made the payments in their own interest to consummate the fraud, although the payments were in the form of loans. If they adopted this fraud with knowledge of its nature, and assisted in carrying it through to execution for their own benefit, they are liable to the plaintiff for all damages suffered from it. *Patten* v. *Gurney*, 17 Mass. 182, 185. *Brown* v. *Perkins*, 1 Allen, 89, 98. *Boston* v. *Simmons*, 150 Mass. 461. *Oulighan* v. *Butler*, 189 Mass. 287, 293. The fact that the debt existing in the plaintiff's favor when the testator died was paid does not relieve them from liability for the consequences which resulted directly to the plaintiff from the execution of the fraud, and which presumably was contemplated by the testator as likely to result.

The fact that a will had been proved, of which the defendants were executors, and that the payments were such as the executors were directed to make is no justification of the payments, if they were made by the beneficiaries under the will in their own interest, when they knew that the making of the will was a part of a fraudulent scheme to continue the business in such a way as to defraud creditors and others for the benefit of these defendants, and if they made the payments to assist in the consummation of the fraud. Even as executors they might have been justified in disregarding the directions of the will and declaring the estate insolvent, or taking other measures to give creditors the benefit of payment from the testator's property.

We are of opinion that the evidence against these defendants should have been submitted to the jury.

*Exceptions sustained.*