## MASHIE BERENSON *vs.* H. G. VOGEL COMPANY.

Suffolk.   December 2, 1924. — June 29, 1925.

Present: RUGG, C.J., BRALEY, PIERCE, WAIT, & SANDERSON, JJ.

*Contract,* Validity.   *Restraint of Trade.   Conspiracy.*

The inquiry, whether there is an unlawful purpose creating or tending to create a monopoly which will render invalid a contract for the furnishing of labor and material, primarily is a question of fact in a suit raising that contention; the facts peculiar to the business, the conditions before and after the alleged restraint was imposed, its nature, and the purpose sought to be attained, as well as prevalent economic necessities, are to be considered as relevant.

Upon facts found by a master, who heard a suit in equity involving the question whether a contract made in October, 1919, for the sale and installation by the defendant for the plaintiff of a sprinkler system was void on the ground that, when it was made and during its performance, the defendant with other dealers in sprinklers was engaged in an illegal combination, trust, or conspiracy forbidden by St. 1908, c. 454, now G. L. c. 93, §§ 2, 3, and by the Sherman Act of July 2, 1890, c. 647, §§ 1, 2, 26 U.S. Sts. at Large, 209, it appeared that in preparing to make his bid the defendant made use of an organization established by himself and six other dealers known as the Fire Protection Survey Bureau, the scope and object of which was to promote economy and efficiency of operation, and that there was no attempt to suppress or destroy competition.   There was no finding or evidence warranting a conclusion in accordance with allegations in the bill that there was conspiracy or collusion between the companies to defraud the plaintiff by a secret, material enhancement of price, so that, instead of obtaining the lowest estimate, he paid a maximum or extortionate price.   *Held,* that a decree dismissing the bill was warranted.

BILL IN EQUITY, filed in the Superior Court on July 21, 1921, and afterwards amended, seeking to enjoin the defendant "from taking any action at law or in equity, by replevin proceedings or otherwise for the purpose of removing sprinklers" which the defendant had installed in a garage of the plaintiff in Boston, that a contract between the plaintiff and the defendant relating to the installation of the sprinklers be declared illegal and void and that the court "determine

the fair and reasonable value including a fair and reasonable profit of the sprinkler system" thus installed.

The defendant was permitted to file a cross bill seeking a decree directing that the contract price be ordered paid if the contract was adjudged legal, and that, if it were adjudged illegal, it be paid "the fair and reasonable value, including a fair and reasonable profit of the sprinkler system installed pursuant to said contract." The plaintiff demurred and answered to the cross bill.

The bill and cross bill were heard by a master. Material findings by the master are described in the opinion.

The plaintiff was permitted to file exceptions to the report late. The exceptions were heard by *Morton*, J., by whose order there were entered an interlocutory decree overruling the exceptions and confirming the report, and a final decree dismissing the bill, and, on the cross bill, adjudging that there was due to the defendant from the plaintiff the sum of $5,527.78 and ordering that execution issue for that sum and for interest to be paid to the defendant. The plaintiff appealed.

*B. Berenson & W. B. Keenan*, for the plaintiff, submitted a brief.

*J. G. Palfrey & M. C. Taylor*, for the defendant.

Braley, J. The plaintiff, owner of a building in the city of Boston, having been required by law to equip it with an automatic fire sprinkler system, entered, on or about October 16, 1919, into a contract with the company to install the necessary apparatus. The work was completed to the plaintiff's satisfaction May 4, 1920, and partial payments were made, leaving a balance of $4,447.13, which the plaintiff stipulated the company was entitled to recover under its cross bill if the contract was enforceable. We shall refer to Berenson as the plaintiff, and to the H. G. Vogel Company, Inc. as the defendant. The defendant under the contract retained title, and if the plaintiff defaulted it could remove any part of the equipment. If removal became necessary, the plaintiff also engaged to pay the reasonable value of the services for installation, and for removal, as well as all other

expenses incurred, and any loss or injury thereby caused. It is alleged, that because of the plaintiff's failure to make full payment, the defendant has threatened such removal, which will seriously damage the plaintiff. The material prayers are, that the contract be declared illegal and void, with injunctive relief, on the ground that when made, and during its performance, the defendant with other dealers in sprinklers was engaged in an illegal combination, trust, or conspiracy forbidden by St. 1908, c. 454, now G. L. c. 93, §§ 2, 3, and by the Sherman act of July 2, 1890, c. 647, §§ 1, 2, 26 U. S. Sts. at Large, 209.

It is necessary, however, before considering the merits, to dispose of certain interlocutory questions. The demurrer to the cross bill was waived by the defendant proceeding to a hearing on the merits. *Torrey* v. *Parker*, 220 Mass. 520. We assume in favor of the plaintiff that his exceptions to the master's report were properly allowed to be filed under a special order of the court. *Nye* v. *Whittemore*, 193 Mass. 208, 209.

While the exceptions as a whole are not specifically argued, and need not be separately reviewed, it is generally contended by the plaintiff, apparently under his third exception, that, being unsupported by his preceding findings as to combination and conspiracy, the master's final conclusions upholding the validity of the contract were unwarranted, and that the decree dismissing the bill should be reversed. *Phelps* v. *Creed*, 231 Mass. 228. *Simoneau* v. *Landry*, 242 Mass. 578.

Restrictions affecting competition can be striven for without violation of law. *United States* v. *United Shoe Machinery Co.* 247 U. S. 32. And a consolidation or combination of corporations engaged in a common business enterprise does not show an unlawful purpose. *Board of Trade of Chicago* v. *United States*, 246 U. S. 231. The pertinent inquiry, whether there is an unlawful purpose creating or tending to create a monopoly depends on the circumstances of each case. The facts peculiar to the business, the conditions before and after the alleged restraint was imposed, its nature, and the purpose sought to be attained, as well as prevalent economic necessities, are to be considered as

relevant.   It is primarily a question of fact.   *Board of Trade of Chicago* v. *United States*, 246 U. S. 231.   *United States* v. *United States Steel Corp.* 251 U. S. 417.   *Commonwealth* v. *Dyer*, 243 Mass. 472.

The following findings appear in the master's report on evidence not reported.   The defendant, from a trade paper having ascertained that the plaintiff was building a garage, applied to the Boston office of the Fire Protection Survey Bureau for particulars as to the engineering work necessary for the installation of a sprinkler system.   It received from the Bureau a "quantity estimate sheet" giving the outline of the building, and its water connections, with a supplemental report entitled "Specifications."   The defendant, having applied the figures or data to its price list book and to the quantity estimate sheet, "took off a discount three from of 60%, allowed a small sum for extras, and sent in a bid on the sprinkler work to the plaintiff's architect of $6,490."   The plaintiff also received higher bids from the Rockwood Sprinkler Company, and the Globe Automatic Sprinkler Company, as well as two bids from other sources. The defendant after some delay notified the plaintiff that its bid was increased to $7,153.   But upon conference the price was fixed at $6,750, which was inserted in the contract. The defendant also was obliged to have a construction engineer make measurements of the work and prepare a complete set of plans which had to be approved by the building department and the fire underwriters of the city. If the approval of the fire board was not obtained, insurance rates because a sprinkler system had not been installed could not be procured.   The defendant, following the plan, assembled and shipped the necessary material to the building. If the plans were not complete, the exact number of sprinkler heads could not be ascertained, and because of this condition the clause in the contract relating to charging or crediting sprinkler heads at $5.50 each was inserted.   It is plain, that the contract on the foregoing statement of its origin and formation bears no taint of illegality.

But at some time during the period of the World War the companies engaged in installing sprinklers had formed an

Automatic Sprinkler Committee for war service to act in combination with the United States Government's War Industries Board. The history and development of this arrangement and its general operation and management is fully shown by the report. But after it had been in operation for some eight months, one Wellman, a member of the committee, was convinced that on account of the many duplications, inaccuracies, changes, and conflicting ideas, a very great saving could be accomplished generally by having one engineering office make an accurate survey of each prospective sprinkler equipment; he submitted a proposition to several sprinkler companies, which was accepted, that an engineering organization should be established, and that Wellman should be engaged by the companies to make all "estimate surveys." The economic reasons for this plan led to the formation June 7, 1918, under the laws of Illinois, of a corporation known as H. H. Wellman, Inc., which name was changed September 7, 1918, to the Fire Protection Survey Bureau. It subsequently became a member of the National Fire Protection Association. The representatives of six companies, including the defendant, which had been members of the committee for war service, were the promoters, officers, directors, and stockholders of the corporation. It is found that the object of the Bureau was to reduce the cost to the six companies of obtaining information necessary to submit bids. The Bureau never followed the open competition plan or acted in any way for the purpose of dividing business among the companies, or to encourage collusive bidding. It had no means of knowing and did not know what bids were made. No member was entitled to know or did know who had asked for a survey. The only information it ever received from members was in the form of a notice of the securing of a contract with no statement of the price. The organization of the Bureau, whether tested by the paper form, or by its acts, was to reduce the cost to the six companies in obtaining information necessary to submit bids on prospective work, and, when formed in 1918, all of the six companies were short of employees, and engineers were very scarce. It did not concern itself with

prices, or inform one bidder of the estimate made by another bidder, and the companies have not kept prices at artificial levels by any combination or conspiracy between them. The Bureau among other cities opened an office and appointed a manager in the city of Boston and each department manager made a monthly report of the work to the home office in Chicago. Wellman, who was not connected with any company, acted as vice-president, director and general manager, and visited each department eight or ten times a year, giving notice of his coming to the companies. The department of the Bureau in Boston, which was in operation from October, 1918, to July, 1921, and consisted of the six companies, the Rhode Island Supply and Sprinkler Company, with three other subscribers, was conducted in accordance with the plan just described. When this department received an order for a survey, as in the case at bar, one of its engineers obtained the necessary information, sent it to the member as "a quantity estimate sheet" furnished by the home office, accompanied by a plot plan showing the water supply with a supplemental report exhibiting local conditions as to the fire hazard. The offices of the National Automatic Sprinkler Association, of which the six companies were members, were filled by different representatives of the companies except the secretary and treasurer who were not connected with any company. It did not employ servants or agents, and "did nothing outside of New York." It did however establish and maintain an information service for the members which included the standardization of trade, and technical, mechanical or engineering practices, which the master details. At its meetings or the meetings of the executive committee of the association, questions of interest pertaining to the sale of sprinklers were discussed which were largely confined to labor matters, and to general conditions affecting the trade or industry. The scope and purpose of these organizations with which the defendant was affiliated when the contract was made the master finds was to promote economy and efficiency of operation, and there was no attempt to suppress or destroy competition. *Board of Trade of Chicago* v. *United States, supra.* It also does not appear that

the Bureau acted oppressively as to the plaintiff or others who were in the market for the purchase and installation of sprinklers. If, as the report states, the defendant and other companies were unwilling to sell their sprinkler heads to outside companies or to individuals, it is found that there was no combination between them to keep sprinkler heads, which were an essential part of the system, from the market. "It was purely the . . . desire of each one to refrain from selling its product."

The plaintiff accordingly has failed to establish the material allegations of the bill, that the purpose of the Bureau or of the Association either acting singly or in combination was to monopolize or attempt to monopolize interstate trade, or to form a trust, or conspiracy in restraint of trade, or to create a monopoly in the manufacture or sale in this Commonwealth of any article or commodity in common use, or to stifle competition in the supply or price of any such article or commodity. *Standard Oil Co. of New Jersey* v. *United States,* 221 U. S. 66. *United States* v. *St. Louis Terminal Railroad,* 224 U. S. 383, 394. *United States* v. *Reading Co.* 226 U. S. 324, 369. *Cement Manufacturers Protective Association* v. *United States,* 268 U. S. 588, decided by the United States Supreme Court June 1, 1925. *Hoban* v. *Dempsey,* 217 Mass. 166. *Commonwealth* v. *North Shore Ice Delivery Co.* 220 Mass. 55. *Quincy Oil Co.* v. *Sylvester,* 238 Mass. 95. *Goyette* v. *C. V. Watson Co.* 245 Mass. 577, 592, 593. The cases of *United Shoe Machinery Co.* v. *La Chappelle,* 212 Mass. 467, *Merchants Legal Stamp Co.* v. *Murphy,* 220 Mass. 281, and *Commonwealth* v. *Dyer,* 243 Mass. 472, are distinguishable.

It is further alleged that when the plaintiff submitted the plans to the defendant and other companies, the price named by the defendant and the other companies, while about the same as the contract price, was the result of fraudulent and collusive bidding, and that the plans, having been "figured" at the office of the Fire Protection Survey Bureau, of the existence of which, or its methods of service, he is found to have been ignorant when the contract was made, were not independently considered by each of the companies to which

they were submitted for bids. The six companies and the Rhode Island Sprinkler and Supply Company maintained an office in Boston in charge of one Miss Barrett, who was an employee of the Rhode Island Company. These companies paid the rent and her salary, with other incidental expenses such as the cost of office furniture, files for keeping papers, and the installation and maintenance of a telephone. If any company bid for sprinklers, it sent her a statement of the work with the bid on "a quantity estimate sheet." If a bid and statement was received from another company, she made a synopsis of the statements and bids and sent them to each bidder, and if any company executed a contract for any particular work, the agreed price was reported and kept with the file relating to the transaction. The companies were designated by her and among themselves by a number and not by name, and the method of business so conducted was known by companies concerned as "open price competition." The office was discontinued the last of 1917 or the beginning of 1918, Miss Barrett was discharged, and the files, minute books, and other papers were destroyed. But even if the files were open to the inspection of any company, with the lists of contracts, copies of which were sent to all the companies, this arrangement, with which the Bureau had no connection, was terminated prior to the plaintiff's contract, and the charge of conspiracy and collusion, in the twelfth and thirteenth paragraphs of the bill, between the companies to defraud the plaintiff by a secret, material enhancement of price, so that, instead of obtaining the lowest estimate, he paid a maximum or extortionate price, is explicitly found to be groundless.

The result reached by the master, that during the year 1919 there did not exist in Boston or its vicinity a combination or conspiracy among companies, including the defendant, engaged in installing sprinkler systems for the purpose of creating a monopoly in the manufacture, production or sale of automatic sprinklers, or restraining competition in such manufacture, production or sale, or restraining trade or commerce among the several States in violation of the laws

of the United States is supported by his previous findings for reasons already stated, and is in conformity with the law governing the case.

The defendant, who was given relief by the cross bill, also appealed, because the decree did not recite the proceedings. But, the company not having suffered any material harm, no change is necessary. The interlocutory decrees allowing the exceptions to be filed and overruling the exceptions and confirming the report are affirmed, and the final decree is also affirmed with costs.

*Ordered accordingly.*