THE AMERICAN AGRICULTURAL CHEMICAL COMPANY OF MASSACHUSETTS & others *vs.* HUGH J. ROBERTSON & others.

Suffolk.    May 22, 1930. — October 8, 1930.

Present: RUGG, C.J., CROSBY, CARROLL, WAIT, & SANDERSON, JJ.

*Equity Jurisdiction*, To relieve from results of fraud, Plaintiff's clean hands. *Evidence*, Relevancy and materiality. *Corporation*, Officers and agents. *Fraud*. *Equity Pleading and Practice*, Master: recommittal, report of evidence. *Trust*, Constructive.

Exclusion by a master, hearing a suit in equity by a group of four coördinated corporations, one of which owned and controlled all the capital stock, except qualifying shares, of the other three, against certain individuals, employees and officers of some of the plaintiffs, to recover sums of money of which the plaintiffs had been defrauded through acts of the defendants in violation of their duties as such employees and officers and in fraud of the plaintiffs, of evidence of illegal and monopolistic acts on the part of the defendants, which preceded or were independent of the fraudulent acts of the defendants or of any of them, was proper.

Where a suit in equity was referred to a master by an interlocutory decree directing him to hear the parties and their evidence and to report his findings to the court together with such facts and questions of law as either party might request, a motion by the defendant that the report be recommitted to the master because he had failed and refused, "though duly requested," to make findings of material facts and to report material facts, alleged to be based upon uncontradicted and uncontroverted testimony of witnesses for the plaintiffs, properly was denied, where the report contained no report of the evidence and it appeared that the request was not made until after the master had settled his draft report and had given copies thereof to counsel for the parties.

Further motions that the stenographic report of the evidence at the hearing before such master be placed on file and that the master report all the evidence, and that the master be ordered to report the exhibits and testimony referred to in an exhibit annexed to objections to the master's report consisting of a schedule of requests for findings submitted to the master at the hearing on the draft report and purporting to incorporate by reference parts of the testimony before the master, properly were denied.

One of the individual defendants in the suit above described appealed from the final decree. The findings of the master were in substance that the subsidiary plaintiffs were engaged in the business of purchasing materials from markets and butcher shops and rendering

them into edible and nonedible oils, tallows and other products; that such appellant, an employee of the principal plaintiff, and an officer in one of the subsidiary plaintiffs, in connivance with other individual defendants and through the use of corporations of which he or they were officers, carried through, or pretended to carry through, sales of material to the subsidiary plaintiffs and, by means of false entries on the books or fictitious prices, caused to be paid to him and to others of the individual defendants by various of the subsidiary plaintiffs moneys rightfully the property of the plaintiffs to whom he and the other individual defendants owed fidelity as officers and employees. *Held*, that

(1) The mere fact that the appellant was not an officer of one of the subsidiary plaintiffs, some of whose moneys he wrongfully received through confederated fraudulent action of himself and a codefendant who was in a fiduciary relation to that corporation, did not relieve the appellant of liability;

(2) The mere fact that one of the defrauded plaintiffs entered into adjustments and agreements with corporations which the appellant had used in the fraud, in which such plaintiff acknowledged itself a creditor of such corporation for certain advances made and the appellant guaranteed payment of the amounts therein referred to, did not relieve the appellant of liability in this action of tort, it appearing that at the time such plaintiff did not have full knowledge or notice of the fraud which the appellant and his confederates had perpetrated upon it;

(3) Whether the appellant might also be liable to such plaintiff upon certain notes or a guaranty which he had given it, was immaterial;

(4) A contract between such plaintiff and the appellant's corporation, which contemplated concerted action in various matters between the defendants and provided that settlements might be made with the appellant with the same effect as if made with his corporation, did not contemplate nor authorize nor justify dishonest conduct on the defendants' part;

(5) It appearing that the plaintiffs lacked knowledge of the material facts as to the fraud perpetrated upon them, a defence of ratification was of no avail;

(6) Knowledge of the defendants' fraudulent conduct on the part of the treasurer of one of the plaintiffs was no defence, it appearing that he aided the defendants in the accomplishment of their fraudulent scheme;

(7) The mere fact that the corporation which the appellant used in his fraud was not also adjudged liable for funds misappropriated by him did not relieve him of liability.

Upon further findings by the master in the suit above described, it appeared that the appellant, then an officer of one of the subsidiary plaintiffs, caused a new corporation to be organized and that plaintiff to pay $5,000 for a majority interest in its capital stock, which was transferred to the appellant, he paying nothing therefor; and that thereafter the appellant and one of his confederates, in entire disregard of his duties as an officer of the subsidiary plaintiff and an employee of the principal plaintiff, caused large sums to be paid to them

as profits from the operations of the corporation. It also appeared that the appellant caused large advances of money to be made by the subsidiary plaintiff to the corporation beyond the amount of material delivered to such plaintiff, for which the corporation gave such plaintiff its notes. In the final decree, the appellant was charged with the profits he received from his corporation but not with the advances, and was ordered to deliver the stock in that corporation to the subsidiary plaintiff. *Held,* that

(1) The appellant rightly was required to return the profits thus received in violation of his duty to the plaintiffs, and the stock purchased with the money of the subsidiary plaintiff;

(2) The amount thus adjudged against the appellant not being based on advances or loans, the question, whether the note received for such advances or loans was given in payment, was immaterial.

In the establishment of a constructive trust it is not necessary to show that money, which was paid for the property wrongfully held by the defendant, was paid when title passed to the defendant.

In the final decree in the suit above described, it was error both to charge the appellant with a sum of money which he improperly had caused one of the plaintiff corporations to pay for capital stock, which was delivered to him, in a corporation he manipulated and also to require him to deliver the stock to that plaintiff.

BILL IN EQUITY, filed in the Superior Court on May 8, 1923, and afterwards amended, by The American Agricultural Chemical Company of Massachusetts, Eastern Oil and Rendering Company, The Brown Company, Inc., and Millenbach Bros. Company against Hugh J. Robertson, Edward T. Murphy, Charles E. North, Joseph Funke, Joseph Funke Company and certain other corporations.

The bill was taken *pro confesso* against the defendants North, Funke, and Joseph Funke Company.

The suit was referred to a master. Material findings by the master, and certain motions by the defendant Murphy, denied by *Broadhurst,* J., are described in the opinion. The closing paragraphs of the master's report are as follows:

"On the completion of my draft report, I furnished counsel of the respective parties with copies thereof and notified them when and where I would receive their suggestions for such alterations as they might think proper. Such suggestions were duly received and after consideration thereof I settled the draft of my report and submitted it to counsel. Within five days thereafter, counsel brought in

their written objections to the report, which are hereto appended.

"At the hearing upon the draft report, counsel for defendants Robertson and Murphy submitted numerous requests to report evidence. I have not complied with these requests for the reason that under the rule I believe I have no power to do so.

"Counsel for defendant Robertson also has requested that I report all of his exceptions to the admission and exclusion of evidence made during the course of the trial. Upon examination of the record I find that there are one thousand six hundred and fifty, more or less, of these exceptions, and as they are spread over the entire record consisting of five thousand seven hundred and twelve pages, it will be necessary to report all of the evidence in the case, in order to properly present the questions of law involved. As I have no power, under the rule, to make such a report, I have refused his request."

By order of *Broadhurst*, J., a final decree was entered ordering, adjudging and decreeing as follows:

"1. That the defendant Edward T. Murphy is adjudged and decreed to hold in trust for the plaintiff The Brown Company, Inc. six hundred and eight shares of the capital stock of Standard Poultry Food & Tallow Manufacturing Company of Trenton, New Jersey, and he is hereby ordered to endorse, transfer and deliver certificates for the same to the plaintiff The Brown Company, Inc.

"2. That the defendant Edward T. Murphy is adjudged and decreed to hold in trust for the plaintiff Millenbach Bros. Company two thirds of the capital stock of Joseph Funke Company of Detroit, Michigan, and he is hereby ordered to endorse, transfer and deliver certificates for the same to the plaintiff Millenbach Bros. Company.

"3. That the defendant Hugh J. Robertson is adjudged and decreed to hold in trust for the plaintiff Eastern Oil and Rendering Company one hundred shares of the capital stock of Coolidge Corner Market, Inc. of Brookline, Massachusetts, and he is hereby ordered to endorse, transfer and

deliver certificates for the same to the plaintiff Eastern Oil and Rendering Company.

"4. That the defendant Edward T. Murphy is adjudged and decreed to have diverted the funds of the plaintiff Eastern Oil and Rendering Company as follows:

| | |
|---|---|
| Through Cooperative Rendering Company . | $30,887.32 |
| Interest thereon May 8, 1923, to January 31, 1930 . . . . . . . . . | 12,473.06 |
| Total . . . . . . . . | $43,360.38 |

and he is hereby ordered to pay said sum of $43,360.38 to the plaintiff Eastern Oil and Rendering Company together with interest thereon at the rate of six per cent per annum from the date of this decree.

"5. That the defendants Hugh J. Robertson and Edward T. Murphy are adjudged and decreed to have conspired together to divert funds of the plaintiff The Brown Company, Inc. and to have diverted thereby funds of said plaintiff as follows:

| | |
|---|---|
| Through Joseph Funke Company . . . | $2,650.00 |
| Interest thereon November 1, 1922, to January 31, 1930 . . . . . . . | 1,152.75 |
| Total . . . . . . . . | $3,802.75 |

and they are hereby jointly and severally ordered to pay said sum of $3,802.75 to the said plaintiff The Brown Company, Inc. together with interest thereon at the rate of six per cent per annum from the date of this decree.

"6. That the defendants Hugh J. Robertson and Edward T. Murphy are adjudged and decreed to have conspired together to divert funds of the plaintiff Millenbach Bros. Company and to have diverted thereby funds of the said plaintiff as follows:

| | | |
|---|---|---|
| A. Through Joseph Funke Company . . . . . | $15,201.74 | |
| Interest thereon April 1, 1923, to January 31, 1930 . . | 6,232.71 | $21,434.45 |

B. Through Joseph Funke Com-
    pany  .   .   .   .   .  $18,468.07
    Interest thereon May 1, 1923,
      to January 31, 1930  .  .    7,479.56  $25,947.63

C. Through Joseph Funke Com-
    pany  .   .   .   .   .  $ 1,250.00
    Interest thereon October 12,
      1922, to January 31, 1930    547.50    1,797.50

      Total    .   .   .   .   .   .   .  $49,179.58

and they are hereby jointly and severally ordered to pay said sum of $49,179.58 to the said plaintiff. Millenbach Bros. Company together with interest thereon at the rate of six per cent per annum from the date of this decree.

"7. That the defendant Edward T. Murphy is adjudged and decreed to have diverted the funds of the plaintiff The Brown Company, Inc. as follows:

A. Through Philadelphia Render-
    ing Company    .   .   .  $ 2,500.00
    Interest thereon February 7,
      1923, to January 31, 1930    1,047.50  $ 3,547.50

B. Through Philadelphia Render-
    ing Company    .   .   .    329.70
    Interest thereon March 1,
      1923, to January 31, 1930    136.82    466.52

C. Through The Brown Com-
    pany, Inc.  .   .   .   .    1,290.79
    Interest thereon May 8, 1923,
      to January 31, 1930  .  .    565.76    1,856.55

      Total  .   .   .   .   .   .   .   .  $ 5,870.57

and he is hereby ordered to pay said sum of $5,870.57 to the said plaintiff The Brown Company, Inc. together with interest thereon at the rate of six per cent per annum from the date of this decree.

"8. That the defendants Hugh J. Robertson and Edward T. Murphy are adjudged and decreed to have conspired together to obtain for themselves and to have obtained thereby certain benefits and profits to which in equity and good conscience the plaintiff The Brown Company, Inc. is justly entitled as follows:

A. Through Standard Poultry
   Food & Tallow Manufac-
   turing Company . . . $28,592.20
   Interest thereon May 8, 1923,
   to January 31, 1930 . . 11,554.11 $40,146.31

and they are hereby jointly and severally ordered to pay said sum of $40,146.31 to the said plaintiff The Brown Company, Inc. together with interest thereon at the rate of six per cent per annum from the date of this decree.

"9. That the defendant Edward T. Murphy is adjudged and decreed to have obtained for himself certain benefits and profits to which in equity and good conscience the plaintiff Millenback Bros. Company is justly entitled as follows:

A. Through Joseph Funke Com-
   pany . . . . . $25,000.00
   Interest thereon October 12,
   1922, to January 31, 1930 10,950.00 $35,950.00

B. Through Joseph Funke Com-
   pany . . . . . 8,100.00
   Interest thereon October 28,
   1922, to January 31, 1930 3,527.55 11,627.55

   Total . . . . . . . $47,577.55

and he is ordered to pay said sum of $47,577.55 to the plaintiff Millenbach Bros. Company together with interest thereon at the rate of six per cent per annum from the date of this decree.

"9½. That the defendant Hugh J. Robertson is adjudged and decreed to have obtained for himself certain benefits

and profits to which in equity and good conscience the plaintiff Millenbach Bros. Company is justly entitled as follows:

| | |
|---|---:|
| Through Millenbach Bros. Company . . | $100.00 |
| Interest thereon May 8, 1923, to January 31, 1930 . . . . . . . . . | 40.38 |
| Total . . . . . . . . | $140.38 |

and he is hereby ordered to pay the same to the plaintiff Millenbach Bros. Company together with interest thereon at the rate of six per cent per annum from the date of this decree.

"10. That the defendant Hugh J. Robertson obtained for himself certain benefits and profits to which in equity and good conscience the plaintiff Eastern Oil and Rendering Company is justly entitled as follows:

| | | |
|---|---:|---:|
| A. Through Coolidge Corner Market, Inc. . . . | $ 1,050.00 | |
| Interest thereon December 31, 1920, to January 31, 1930 | 572.25 | $ 1,622.25 |
| B. Through Coolidge Corner Market, Inc. . . . | 3,000.00 | |
| Interest thereon December 31, 1921, to January 31, 1930 | 1,455.00 | 4,455.00 |
| C. Through Coolidge Corner Market, Inc. . . . | 2,500.00 | |
| Interest thereon December 31, 1922, to January 31, 1930 | 1,062.50 | 3,562.50 |
| D. Through Coolidge Corner Market, Inc. . . . | 2,500.00 | |
| Interest thereon December 31, 1923, to January 31, 1930 | 852.50 | 3,352.50 |
| Total . . . . . . . | | $12,992.25 |

and he is hereby ordered to pay said sum of $12,992.25 to the plaintiff Eastern Oil and Rendering Company together with interest thereon at the rate of six per cent per annum from the date of this decree.

"11. That the defendants Hugh J. Robertson and Edward T. Murphy are adjudged and decreed to have conspired together to obtain for themselves and to have obtained thereby certain benefits and profits to which in equity and good conscience the plaintiff Eastern Oil and Rendering Company is justly entitled as follows:

| | |
|---|---:|
| Through What Cheer Chemical Company and Eagan Company . . . . . | $514.98 |
| Interest thereon May 8, 1923, to January 31, 1930 . . . . . . . . . | 207.96 |
| Total . . . . . . . . | $722.94 |

and they were hereby jointly and severally ordered to pay said sum of $722.94 to the plaintiff Eastern Oil and Rendering Company together with interest thereon at the rate of six per cent per annum from the date of this decree.

"12. That the defendants Edward T. Murphy and Hugh J. Robertson are adjudged and decreed to have been unfaithful to their employer, the plaintiff, The American Agricultural Chemical Company, but that the losses caused thereby or the profits moving to them therefrom are all referable to specific plaintiffs as set forth in this decree.

"Wherefore the plaintiff, The American Agricultural Chemical Company, is not entitled to affirmative relief and it is decreed that the bill of complaint as to the plaintiff, The American Agricultural Chemical Company, be and it hereby is dismissed.

"13. That the plaintiff The Brown Company, Inc. have execution against said defendants Hugh J. Robertson and Edward T. Murphy for $43,949.06, being the sum of all the amounts hereinbefore adjudged to be due from said defendants jointly to said plaintiff, as more particularly set forth in Paragraphs Nos. 5 and 8 of this decree.

"14. That the plaintiff The Brown Company, Inc. have

execution against said defendant Edward T. Murphy for $5,870.57, being the sum of all the amounts hereinbefore adjudged to be due from said defendant to said plaintiff, as more particularly set forth in Paragraph No. 7 of this decree.

"15. That the plaintiff, Millenbach Bros. Company have execution against said defendants Hugh J. Robertson and Edward T. Murphy for $49,179.58, being the sum of all the amounts hereinbefore adjudged to be due from said defendants to said plaintiff, as more particularly set forth in Paragraph No. 6 of this decree.

"16. That the plaintiff, Millenbach Bros. Company, have execution against said defendant Edward T. Murphy for $47,577.55, being the sum of all the amounts hereinbefore adjudged to be due from said defendant to said plaintiff, as more particularly set forth in Paragraph No. 9 of this decree.

"16½. That the plaintiff Millenbach Bros. Company have execution against said defendant Hugh J. Robertson for $140.38, being the sum of all the amounts hereinbefore adjudged to be due from said defendant to said plaintiff, as more particularly set forth in Paragraph No. 9½ of this decree.

"17. That the plaintiff, Eastern Oil and Rendering Company have execution against said defendants Hugh J. Robertson and Edward T. Murphy for $722.94, being the sum of all the amounts hereinbefore adjudged to be due from said defendants to said plaintiff, as more particularly set forth in Paragraph No. 11 of this decree.

"18. That the plaintiff, Eastern Oil and Rendering Company have execution against said defendant Edward T. Murphy for $43,360.38, being the sum of all the amounts hereinbefore adjudged to be due from said defendant to said plaintiff, as more particularly set forth in Paragraph No. 4 of this decree.

"18½. That the plaintiff Eastern Oil and Rendering Company have execution against said defendant Hugh J. Robertson for $12,922.25, being the sum of all the amounts hereinbefore adjudged to be due from said defendant to

said plaintiff, as more particularly set forth in Paragraph 10 of this decree.

"19. That the plaintiffs Millenbach Bros. Company, Eastern Oil and Rendering Company and The Brown Company, Inc. recover costs against both defendants in the sum of $83.70 as taxed by the clerk and that execution issue therefor."

The defendants Murphy and Robertson appealed.

*F. H. Stewart*, (*F. X. Daly & C. S. Wing* with him,) for Murphy.

*S. C. Rand*, (*M. E. Foster* with him,) for the plaintiffs.

SANDERSON, J. This is a suit brought to obtain an accounting of corporate funds and other property alleged to have been unlawfully diverted from the plaintiff corporations by the defendants Robertson and Murphy for the use of themselves and others associated with them, and for other relief. After answers were filed by the defendants the case was sent to a master under an order of reference requiring him to hear the parties and their evidence and to report his findings to the court together with such facts and questions of law as either party might request. The master's report first filed was recommitted for purposes not now necessary to discuss, and a supplemental report filed. Murphy filed motions to recommit, to report all the evidence, to order the master to report certain evidence and exhibits, and to place the stenographic report of the evidence on file. All these were denied and an interlocutory decree was entered confirming the report, followed by a final decree granting relief to certain of the plaintiffs. Robertson and Murphy, who will be referred to as the defendants, appealed from the several orders and decrees adverse to them, but Robertson filed no brief and must therefore be deemed to have waived all rights under his appeal, and matters affecting his rights will not be considered except as they are necessarily involved in determining the rights of Murphy.

The plaintiff The American Agricultural Chemical Company, hereinafter called the Chemical Company, owns and controls all the capital stock, except qualifying shares,

of the plaintiffs Eastern Oil and Rendering Company, of Boston, referred to as the Eastern Oil, The Brown Company, Inc., of Philadelphia, and the Millenbach Bros. Company, of Detroit. During the time covered by the bill these companies were engaged in the business of purchasing materials from markets and butcher shops and rendering them into edible and nonedible oils, tallows and other products. Robertson was the manager of the rendering department of the Chemical Company, and in that capacity exercised authority over The Brown Company, Inc. and Millenbach Bros. Company, as well as over the Eastern Oil of which he was president and a director. Murphy was president, treasurer and a director of The Brown Company, Inc., and in charge of its business. Charles E. North was president, a director and manager of Millenbach Bros. Company and in charge of its business. The defendants and North were also employees of the Chemical Company.

Questions raised by the appeals of Murphy from orders of the court denying certain motions will first be considered. His motion to recommit the report, with a request that the master be instructed to report additional findings of fact, was based on two grounds: (1) that the master had excluded certain material and competent evidence appearing in an offer of proof incorporated in the report, and (2) that he had failed and refused, though duly requested, to make findings of material facts and to report material facts with his findings thereon, alleged to be based upon uncontradicted and uncontroverted testimony of witnesses for the plaintiffs, as more specifically set forth in the defendant Murphy's objections to the report.

The exception to the exclusion of the evidence contained in the offer of proof was saved under the following circumstances: Murphy having testified that he went into the slaughtering and rendering business in 1913 or 1914 in a concern that was in 1916 merged with the Cooperative Slaughtering and Rendering Company, herein referred to as the Slaughtering Company, and that he ceased to do rendering in that company because of competition with

the Eastern Oil and others, was asked, "Tell the master what happened to you." When asked by the master, upon objection being made by the plaintiffs, how this was important, counsel for Murphy made a detailed offer of proof to the effect that the group of renderers in Boston forced him to deliver his material to one of them under a threat of ruination if he did not, that the plaintiffs constituted an illegal combination formed to restrain trade, stifle competition and create a monopoly to the injury of the defendant Murphy, and that Robertson managed the operations of the combination for the purpose of maintaining it. The master then excluded the evidence offered to prove that the plaintiffs had formed an illegal combination or that such was their ulterior purpose; but, as we interpret the record, no evidence was excluded tending to prove knowledge of or acquiescence in or approval by the plaintiffs of the advances, payments and loans referred to in the bill of complaint, or to prove that the plaintiffs authorized the making of the contracts and loans, or that the contracts were prepared by counsel for the plaintiffs and with their approval. This ruling excluding evidence would be justified on the ground that the evidence offered was not responsive to the question asked but it was right on broader grounds.

The suit against Murphy is based in part upon breaches of fiduciary duty toward the plaintiffs, arising out of his employment in a capacity of trust and confidence, and in part upon his cooperation with Robertson and with North in their violation of similar duties to the corporations by which they were employed or of which they were officers. The fact that Murphy had previously been driven out of an independent business as a result of the monopolistic schemes of the plaintiffs can have no bearing on such a suit. The contract with Murphy and the relationship of trust flowing from it stand unimpaired. No previous ill or illegal treatment of Murphy at the hands of the plaintiffs would justify him in entering into such a relationship and subsequently using this trust and confidence as a cloak to hide the fraudulent diversion of the plaintiffs' property.

Nor can Murphy escape liability for his part in the transactions in Detroit, to which reference will hereafter be made, by proving that the plaintiffs were there operating as an illegal combination and that the current prices of materials there were fictitious and arbitrary. In *Pelosi* v. *Bugbee*, 217 Mass. 579, 581, the court said, "the fact that the owner of property has violated the law with reference to it is not a bar to an action by him against a wrongdoer to whose wrongful act the plaintiff's illegal conduct has not contributed." Murphy's personal wrongdoing, upon the facts found, arose independently of any action of the plaintiffs asserted to be illegal in Murphy's offer of proof, and the evidence excluded would afford no defence to this suit. *Duane* v. *Merchants Legal Stamp Co.* 231 Mass. 113, 117. *Boylston Bottling Co.* v. *O'Neill*, 231 Mass. 498. *Commonwealth* v. *Dyer*, 243 Mass. 472, 486. *Berenson* v. *H. G. Vogel Co.* 253 Mass. 185, 191. *Connolly* v. *Union Sewer Pipe Co.* 184 U. S. 540. *D. R. Wilder Manuf. Co.* v. *Corn Products Refining Co.* 236 U. S. 165. *Strait* v. *National Harrow Co.* 51 Fed. Rep. 819.

With respect to the second ground of the motion to recommit, what was said in *A. T. Stearns Lumber Co.* v. *Howlett*, 260 Mass. 45, 73, is applicable: "The order of reference stipulated, that the cause be referred to the master 'to hear the parties and their evidence and report his findings to the court together with such facts and questions of law as either party may request.' *Cook* v. *Scheffreen*, 215 Mass. 444, 447, 448. But, the request not having been made before the parties were informed of the contents of the draft report, these exceptions must be overruled. *Tuttle* v. *Corey*, 245 Mass. 196, 203, 204. *Daniels* v. *Daniels*, 240 Mass. 380, 384." Murphy contends that the facts alluded to in the second ground of the motion differentiate the case because they are "undisputed facts," basing this contention on his statement that the facts were admitted by officers of the plaintiffs or other witnesses called in their behalf. But upon this record the evidence, whatever its nature may have been, is not before us, and the contention that the findings are not supported by the

evidence is not open to the defendant. *Chamberlain* v. *Henry*, 263 Mass. 63, 65. *Goodman* v. *Goldman*, 265 Mass. 85, 87, 88. *Brown* v. *Little, Brown & Co.* (*Inc.*) 269 Mass. 102, 105. The motion to recommit was properly denied as to the second ground.

The motions that the stenographic report of the evidence be placed on file and that the master report all the evidence were properly denied. "When a party goes to trial before a master under an order of reference which does not direct him to report the evidence in whole or in part, it is too late to ask that that be done, at least after the terms of his draft report have come to the knowledge of the parties. The purpose of such an order of reference is to leave to the master the final determination of the facts, and there is no justice in giving to the unsuccessful party who has taken his chances of a final determination in his favor an opportunity to try over again before the court the facts which were to be finally determined by the master. That has long been the settled rule of this court." *Cook* v. *Scheffreen*, 215 Mass. 444, 448. See also *Warfield* v. *Adams*, 215 Mass. 506, 508; *Wood* v. *Baldwin*, 259 Mass. 499, 511–512.

Murphy also moved that the master be ordered to report the exhibits and testimony referred to in an exhibit annexed to objections to the master's report consisting of a schedule of requests for findings submitted to the master at the hearing on the draft report, and purporting to incorporate by reference parts of the testimony before the master. For the reasons given in connection with the motion to recommit and the other motions, this last motion was properly denied. None of the motions, exceptions or affidavits filed in the case in behalf of Murphy gave him the right to have the evidence examined by the trial judge, or to have further evidence reported or further facts found.

In 1916 Murphy, who owned and controlled the Slaughtering Company, began to sell and deliver its raw materials to the Eastern Oil. Robertson, who then had full charge of the Eastern Oil, asked the treasurer and head bookkeeper of that company if it were possible to divide the payments

for raw materials purchased of the Slaughtering Company into two parts, one to go to Murphy personally and the other to the Slaughtering Company, without recording the payments to Murphy on the books of the Eastern Oil; and although the treasurer stated in substance that he knew of no way by which this could be done, within a short time at Robertson's express direction such a division was made and monthly payments were thereafter made to Murphy personally. These payments amounted to several thousand dollars in August, 1918, when the Slaughtering Company ceased doing business, but no recovery therefor is sought in this suit. The books of the Slaughtering Company were kept in the office of the Chemical Company under the supervision of the treasurer of the Eastern Oil, who was directed by Robertson, his official superior, not to allow the auditors of the Eastern Oil to examine them. At the end of June, 1918, the Slaughtering Company owed the Eastern Oil a sum somewhat in excess of $5,000. During the two following months the Eastern Oil, under Robertson's direction, permitted this indebtedness to increase to $15,649.24 for advances purporting to have been made for raw material to be delivered, but they were made without regard to the existing state of the account. A large part of the money was used to pay off all creditors of the Slaughtering Company except the Eastern Oil, Murphy being one of the creditors so paid.

On August 21, 1918, the Cooperative Rendering Company, Inc., hereinafter called the Rendering Company, owned and controlled by Murphy, was organized and took over the assets and assumed the liabilities of the Slaughtering Company, which at that time was insolvent, its only creditor being the Eastern Oil to which it was indebted in the sum above set forth. The Rendering Company thereafter delivered raw materials collected by it to the Eastern Oil, and Robertson caused that company to advance money from time to time to the Rendering Company, against which was credited the raw materials delivered by the latter company at prices found to be fair and consistent with market values. The practice of making monthly

payments to Murphy continued after the organization of the Rendering Company until August, 1919, when direct payments to him ceased. Advances also continued to be made without regard to the state of the account. In April, 1919, a written contract was executed between the Eastern Oil and the Rendering Company whereby the latter agreed to sell its raw material to the former for a period of five years.

The master found that between November, 1919, and June, 1922, large sums of money were withdrawn from the Rendering Company by Murphy regardless of its financial condition and of the fact that its indebtedness to the Eastern Oil, its only customer, was increasing and should have been reduced and paid; that many of these withdrawals synchronized with the payments made from time to time by the Eastern Oil to the Rendering Company; that, in his dealings with the Rendering Company and Murphy, Robertson disregarded his duty as president and a director of the Eastern Oil; that as an employee of the Chemical Company and manager of its rendering department he was likewise unfaithful; and that by concerted action, in combination with Murphy, he caused to be advanced and paid by the Eastern Oil to the Rendering Company various sums which in the aggregate exceeded the aggregate value of the materials delivered by the Rendering Company in the sum of $30,-887.32, for which Murphy is held to be accountable to the Eastern Oil.

The master found that with two exceptions the profits which the defendants received and the losses which the plaintiffs have sustained accrued from and were due to combined efforts and concerted action of Robertson and Murphy in the execution of a well defined plan which they consistently followed throughout, and that in the case of the Joseph Funke Company, hereinafter referred to, they had the active coöperation, assistance and support of North, who as officer of the Millenbach Bros. Company and employee of the Chemical Company was also recreant in the performance of his duty. He also found that Robertson and Murphy throughout persistently disregarded the duties which they owed as officers to the stockholders of the East-

ern Oil and The Brown Company, Inc., respectively, and that they were unmindful of their duty to their employer, the Chemical Company. He further found that, because of the trust and confidence reposed in the defendants, facts which led to the disclosure were not discovered until shortly before the bringing of the bill; that, although the funds were drawn through the regular channels and the fact that advances were made was known, the contemplated use of them by the defendants was undisclosed; and that the true relationship between Robertson and Murphy was not discovered by the plaintiffs until shortly before the filing of the bill.

"The defendant, who was a director and president of the company, while not responsible for errors of judgment, was a fiduciary charged with the duty of caring for the property of the corporation and of managing its affairs honestly and in good faith. If this duty has been so violated as to result in impairment of assets, or loss of its property, or of profit to himself, he can be compelled to make full restitution." *Putnam* v. *Handy*, 247 Mass. 406, 409. See also *Beaudette* v. *Graham*, 267 Mass. 7, 12, 13; *Calkins* v. *Wire Hardware Co.* 267 Mass. 52, 60. ". . . funds of a corporation can be lawfully used for corporate purposes only, and, if misappropriated by the directors, they and whoever with notice participates with them, are jointly and severally liable to the corporation for the loss and damage." *Corey* v. *Independent Ice Co.* 226 Mass. 391, 393. *Dolphin* v. *A. C. Lewis Leather Co.* 269 Mass. 132, 145.

Murphy, although not an officer or employee of the Eastern Oil, would be liable for knowingly assisting Robertson, who was in a fiduciary relationship to that corporation, in wrongfully diverting its funds either to himself or to the corporation which he controlled. *Emmons* v. *Alvord*, 177 Mass. 466, 470. *Gurney* v. *Tenney*, 197 Mass. 457, 466. *Lantin* v. *Goodnow*, 207 Mass. 291, 303. *United Zinc Co.* v. *Harwood*, 216 Mass. 474, 476. *Lazenby* v. *Henderson*, 241 Mass. 177, 181. The fact that Robertson was not also adjudged to be liable for this indebtedness is not a defence for Murphy. *Brewer* v. *Boston Theatre*, 104 Mass. 378,

399. *Von Arnim* v. *American Tube Works*, 188 Mass. 515, 519. See also *Ryder* v. *Brockton Savings Bank*, 238 Mass. 52.

In February, 1923, at the request of the Eastern Oil, Murphy, in consideration of the agreement of the Eastern Oil to forbear to demand payment of an advance of about $30,000 from the Eastern Oil to the Rendering Company until March 31, 1924, when the contract between the two corporations would expire, guaranteed the payment of any indebtedness which at that time the Rendering Company might be owing the Eastern Oil. The latter also held as security for the debt notes of the Rendering Company and of Murphy and an assignment from the Rendering Company of net profits. In these obligations, as well as in the agreement by which the Eastern Oil substituted the Rendering Company for the Slaughtering Company as its debtor, the Rendering Company was recognized as the debtor, but upon the findings the transactions were entered into by the Eastern Oil without full knowledge of the facts and none of them operated to release Murphy from responsibility for his wrongful acts. His liability for wrongful conduct being established, it is unnecessary to decide whether he might also be found liable in this suit on his notes or guaranty and, if so, for what amount. The fact that the Eastern Oil still holds the guaranty and notes of Murphy does not relieve him from liability for wrongfully diverting or assisting in the wrongful diversion of corporate funds. The facts found are sufficiently definite and specific to establish his liability.

The contract between the Eastern Oil and the Rendering Company contemplated concerted action in various matters between the defendants and provided that settlements might be made with Murphy with the same effect as if made with the Rendering Company, but it did not contemplate or authorize or justify dishonest conduct on their part. The defence of ratification must also fail because of the findings as to lack of knowledge of material facts by the plaintiffs. *Tremont Trust Co.* v. *Noyes*, 246 Mass. 197, 207. It is evident from the findings that the treasurer of the Eastern Oil aided the defendants in the accomplish-

ment of their fraudulent scheme; his knowledge would not be binding upon the plaintiffs, nor could it be found to be a ratification by them. See *Indian Head National Bank* v. *Clark,* 166 Mass. 27, 30, 31; *Broadway National Bank of Chelsea* v. *Heffernan,* 220 Mass. 247, 249; *Tremont Trust Co.* v. *Noyes, supra; Atlantic Transportation Co. Inc.* v. *Alexander Shipping Co. Inc.* 261 Mass. 1; *National Life Ins. Co. of the United States* v. *Minch,* 53 N. Y. 144. Upon the facts found, the diversion of the funds of the Eastern Oil was accomplished through the agency of the Rendering Company which Murphy controlled, and the fact that that company is not also adjudged to be liable for the money advanced does not absolve Murphy. We find no reversible error in the part of the decree adjudging Murphy to be indebted to the Eastern Oil in the principal sum of $30,-887.32 with interest.

In paragraph 11 of the decree Robertson and Murphy are adjudged to be liable to the Eastern Oil in the sum of $514.98 with interest from the date of filing the bill. This sum represents interest on funds wrongfully withdrawn from its treasury for the period during which they were withheld. In obtaining this money the defendants made use of two corporations, one of which, The Eagan Company, was controlled by Murphy. The master found in connection with this item that Robertson in his dealings with The Eagan Company disregarded his duty as president and a director of the Eastern Oil, that he was unfaithful, and that by concerted action with Murphy he diverted funds of the Eastern Oil and used them for his own purposes. We are of opinion that upon the findings the transaction was fraudulently conceived by Robertson and fraudulently carried out by him and Murphy with the aid of the treasurer of the Eastern Oil for Robertson's benefit, and that the defendants were properly chargeable with the sum found to be due in this paragraph of the decree.

By written contract dated April 6, 1917, Murphy sold his interest in The Brown Company, Inc., to the Chemical Company and entered into the employment of the latter

as president and local manager of The Brown Company, Inc., which was conducting a rendering business in Philadelphia. The Brown Company, Inc., had collection routes of its own for the collection of raw materials in Trenton, New Jersey. In 1921, one Movshovitz built a rendering plant in that city. In January, 1922, Murphy told Movshovitz that they could make a lot of money by organizing a new corporation and giving Murphy fifty-one per cent of the stock, assuring him that the new company would be financed by The Brown Company, Inc. Murphy entered into a written agreement with Movshovitz in February, 1922, to divide the stock of the new company and to engage immediately in the rendering business in Trenton, and on the same day he caused The Brown Company, Inc., to pay the new company $5,000. The company was incorporated as the Standard Poultry Food and Tallow Manufacturing Company and is herein referred to as the Standard Company. Murphy received six hundred eight shares, or fifty-one per cent, of the stock of this company for which he personally paid nothing, the only contribution being the $5,000 from The Brown Company, Inc., to the Standard Company already mentioned. This was the only cash capital of the Standard Company at the time of its organization. Later Murphy indorsed notes of the Standard Company on which it borrowed money. Murphy caused advances to be made by The Brown Company, Inc., to the Standard Company greatly in excess of materials delivered, and to a large extent the business of the Standard Company was financed by the money thus advanced, but the amount adjudged to be due on account of transactions with the Standard Company is not based on advances or loans, and the question, whether a note of the Standard Company to The Brown Company, Inc., for $27,000 was given in payment or was ever delivered need not be decided.

The master found that, "although neither Murphy nor Robertson contributed money or property to the Standard, they nevertheless shared in the division of large sums of money obtained either directly from the Standard or

indirectly through Movshovitz." For a short time Movshovitz, who was treasurer of the Standard Company, and Murphy shared this money equally. Robertson then made demand for a part, and an agreement was reached that Murphy, Movshovitz and Robertson should each have one third of the profits of the Standard Company and thereafter they were divided. The total amount received by Murphy and Robertson from such profits and from withdrawals from the Standard Company in addition to profits was $28,592.20, and in paragraph 8 of the decree they are adjudged to be indebted to The Brown Company, Inc., in that principal sum. In paragraph 1 of the decree Murphy is also adjudged to hold in trust for The Brown Company, Inc., six hundred eight shares of the capital stock of the Standard Company. The master found that, in his dealings with that company and with Robertson and Movshovitz, Murphy entirely disregarded his duty as president and a director of The Brown Company, Inc., and that as an employee of the Chemical Company and local manager of The Brown Company, Inc., he was likewise unfaithful. Upon the facts found the defendants were rightly adjudged to be indebted to The Brown Company, Inc., in the sum stated, and Murphy was rightly adjudged to hold the stock in trust for The Brown Company, Inc. *Boston* v. *Simmons,* 150 Mass. 461, 465, 466. *Lovejoy* v. *Bailey,* 214 Mass. 134, 154, 156. *Essex Trust Co.* v. *Enwright,* 214 Mass. 507. *Beaudette* v. *Graham, supra.*

In February, 1923, at Murphy's request, Movshovitz formed a corporation by the name of Philadelphia Rendering Company, herein called the Philadelphia Company, which was to buy for $7,000 the business of the Satz Rendering Company, then carried on in that city. This sum was never paid in full, but in February, 1923, Murphy caused The Brown Company, Inc., to pay the George Satz Rendering Company $2,500 upon vouchers as advances on account of materials purchased. These vouchers did not express the real purpose of the payments which were in fact used by Murphy as part payments for the Satz business.

The master found that Murphy diverted the funds of the corporation, of which he was president and a director, and used them for his own purposes, and that the sum of $2,500 was so diverted and appropriated by him on February 7, 1923. Murphy sent employees of The Brown Company, Inc., to the plant of the Philadelphia Company to make repairs and to put it in working condition, and also sent to it certain supplies from The Brown Company, Inc. This labor and material had a fair value of $329.70. In paragraphs 7A and B of the decree Murphy is adjudged to be indebted to The Brown Company, Inc., for these two sums with interest. In paragraph 7C he is also charged with travelling expenses to Detroit which he is found to have misappropriated from The Brown Company, Inc. In the conclusions reached in these paragraphs of the decree we find no error.

Late in 1921 Murphy began negotiations with one Joseph Funke for the purchase of his collection routes in Detroit, which, in January, 1922, resulted in an agreement to purchase the routes and business for $5,000. Murphy then requested North to advance funds from the Millenbach Bros. Company in the sum of $6,000.

An attorney was engaged by North in Murphy's presence to organize the Joseph Funke Company, herein called the Funke Company. When this was accomplished North drew a check of the Millenbach Bros. Company for $6,000 which was cashed by the attorney and the cash deposited to the credit of the Funke Company. On the same date the Funke Company was debited on the books of the Millenbach Bros. Company with $6,000 as an advance. The master found that this money, although purporting to be an advance against raw material to be delivered, was not so intended and was not so used, but was in fact made by North at Murphy's request so that it might be used, as North knew, to purchase Funke's business for Murphy, and that it was so used. Murphy at the outset obtained all of the capital stock of the Funke Company, but never paid for any of it, the only consideration for it being the $6,000 obtained from Millenbach Bros. Company. He did

not pay Funke, but later Funke withdrew from the treasury of the Funke Company $5,000 and thus paid himself the price which Murphy had agreed to pay him for his business.

Between April and October, 1922, Murphy withdrew from the Funke Company from time to time various sums which he has since retained amounting in the aggregate to $8,100. In October, 1922, he sold to Funke one third of the capital stock of the Funke Company for $25,000. Robertson advised Funke to make the purchase. Funke gave in payment therefor $10,000 in cash and three notes for $5,000 each. Shortly after the sale, Robertson, Murphy and North met, and Murphy, producing the three notes, represented to the others that he had received but $15,000 for the stock. North demanded and received one of the notes which was later paid by Funke. The master found that this note was intended for North as his share of the profits of the entire Funke enterprise and was given him by Murphy as a reward for his cooperation and assistance in promoting the scheme.

In the ninth paragraph of the decree Murphy was rightly adjudged to have obtained for himself benefits and profits to which in equity and good conscience the Millenbach Bros. Company is entitled in the two principal sums, namely, $25,000 and $8,100, and in the second paragraph of the decree is adjudged to hold in trust for the Millenbach Bros. Company two thirds of the capital stock of the Funke Company. In the establishment of a trust based on fraud it is not necessary to show that the money was paid when the title passed. Upon the findings Murphy gained no title to the business of Funke or to the capital stock of the Funke Company which he is entitled to assert against the Millenbach Bros. Company. We are of opinion that Murphy was rightly held accountable for the proceeds of the stock sold by him, and that the order that he indorse, transfer and deliver the certificates for two thirds of the capital stock of the Funke Company still held by him to the Millenbach Bros. Company was right.

After the Funke Company began business it sold all its

raw material to Millenbach Bros. Company at prices fixed by Robertson. In September, 1922, the Funke Company paid the Millenbach Bros. Company $3,000 in cash. Between April and September, 1922, sums were withdrawn from the Millenbach Bros. Company on account of raw material which had been previously delivered and paid for. These payments were evidenced by three checks with supporting vouchers, but no entries in regard to them were made upon the books of the company. By this device Millenbach Bros. Company was forced to pay a sum approximately one hundred per cent in excess of current Detroit prices for the raw material delivered during the period in question. Again, pursuant to Robertson's further instructions, prices were paid or credited to the Funke Company for raw materials delivered from October, 1922, to and including March, 1923, approximately one hundred per cent in excess of current Detroit prices for similar materials.

The sum of these excess prices thus credited or paid to the Funke Company over and above current market prices is $15,201.74 for which the defendants were held accountable. The master found that here again the defendants regarded only the interests of the Funke Company and ignored those of their employer. In the fall of 1922, Murphy and Funke started to have the Funke Company erect a rendering plant in Detroit. Robertson told North to furnish all money asked for by Funke to build the plant. Advances from the Millenbach Bros. Company were accordingly made amounting to $36,000. To this sum was added the $6,000 first paid, and from this total sum was deducted the price of all materials delivered. In paragraph 6B of the decree the defendants were adjudged to be accountable for the balance thus obtained amounting to $18,468.07 based upon these excessive advances. The master found that the payments were not advances made in the regular course of business, but that the plan followed was in most respects similar to the one adopted and followed in the cases of the Slaughtering, the Rendering, the Standard and the Philadelphia companies; that this plan

was well understood by Robertson and Murphy and was deliberately adopted to promote their own interests to the detriment of Millenbach Bros. Company and of their own employer. In October, 1922, pursuant to Murphy's request and Robertson's instructions, North removed from the plant of Millenbach Bros. Company a mill having a market value of $1,250. This was found to have been appropriated and converted by the defendants without authority, and by the decree they are held accountable for its value. Upon the findings Murphy was rightly adjudged to be liable for excessive prices paid and excessive advances made by the Millenbach Bros. Company and for the conversion, and he gains no rights by reason of the fact that the Funke Company was not also held accountable; but in respect to one of these three items there was error in the amount for which he was held liable.

No credit seems to have been given for the $3,000 paid in cash by the Funke Company to the Millenbach Bros. Company on September 13, 1922. This sum should be deducted from the principal sum of $18,468.07 representing excessive advances and adjudged to be due in section 6B of the decree. There should be a further deduction from this sum of the $6,000 first advanced by the Millenbach Bros. Company which upon the findings was the consideration paid by Murphy for the capital stock of the Funke Company. Murphy having been made to account for the proceeds of the one third of the capital stock sold and to transfer title to the two thirds of the capital stock still held by him should not also be required to pay the consideration given for it. When these sums have been deducted the balance caused by excessive advances is reduced to $9,468.07.

The section of the sixth paragraph of the decree designated by the letter B is to be modified by substituting for $18,468.07 the sum of $9,468.07, and by substituting for the interest therein stated interest on the latter sum from May 1, 1923. The remaining provisions of paragraph 6 of the decree are to stand. It does not appear that, by these provisions or by those of section B of this paragraph of the decree as modified or by those in the sections relating to

the stock of the Funke Company and the proceeds of stock sold, the Millenbach Bros. Company would be paid twice for the same liability. In each paragraph of the decree in which money is adjudged to be due, the decree is to be modified by adding interest on the principal sums therein specified to the date of the final decree after rescript.

All questions argued have been considered, and except as herein modified the final decree must be affirmed with costs.

*Ordered accordingly.*